[Civ. No. 15880. Third Dist. Jan. 11, 1977.]

SOCIETY FOR CALIFORNIA ARCHAEOLOGY,
Plaintiff and Appellant, v.
COUNTY OF BUTTE, Defendant and Respondent;
IRVIN SCHLAF, Real Party in Interest and Respondent.

COUNSEL

Peters, Fuller, Rush, Schooling & Luvaas and John L. Luvaas, Jr., for Plaintiff and Appellant.

Daniel V. Blackstock, County Counsel, for Defendant and Respondent.

Thomas McCampbell for Real Party in Interest and Respondent.

OPINION

PARAS, J.—The Society for California Archaeology appeals from the denial of its petition for a writ of mandate seeking to order the County of Butte (hereinafter Butte) to revoke its approval of a 31-acre residential development near Chico.

The dispute centers around an Environmental Impact Report (hereinafter EIR) prepared by the County of Butte under CEQA (the Cal. Environmental Quality Act, Pub. Resources Code, § 21050 et seq.) at the request of the developer and real party in interest, Irvin D. Schlaf. It is a composite of two documents, a draft EIR and a later supplement thereto. The draft EIR describes the project as a "rural type subdivision of forty (40) lots as an extension of an existing development" located at the mouth of Stilson Canyon, "approximately four miles southeasterly of Chico on the southerly side of Little Chico Creek."

The draft EIR contains the results of a walking archaeological survey led by Michael J. Boynton, Staff Archaeologist at California State University, Chico. That survey revealed six archaeological sites, including three "bedrock mortar stations" located near, but not on, the property. The other three sites, which were actually on the property, were described as "lithic scatter consisting of flakes, cores, scrapers and one hammerstone . . . in addition to one possible millingstone" over all of lot 1 and portions of lots 2, 3, and 30 (SC-4); "light lithic scatter with occasional hoppered mortars and bowl fragments" in the northern halves of lots 7 and 8 (SC-5); and "surface scatter of lithics and culturally altered organic soil" in the northern two-thirds of lots 9 and 10 (SC-6).

The survey noted some "obvious disturbance to the surface" of site SC-5 and that the perimeter of site SC-6 "had been heavily disturbed by

construction activity during the course of constructing the existing diversion dam and channel for Little Chico Creek. The remainder of the site had obviously been cleared of most lithics and had undergone further disturbance during planting and management of the existing almond orchard."

The survey concluded that sites 4, 5 and 6 "may have the potential, through excavation if necessary, to make a significant contribution to the prehistory of the specific area in question and to the region as a whole." However, because of the disturbed nature of the sites, the survey added "a test excavation in each site is necessary before a professionally adequate assessment of impact may be made . . . ." The cost of three proposed test excavations, analysis of data and preparation of reports was estimated by the survey report at $1,900.60.

The draft EIR originally concluded that "The proposal does not have a significant effect on natural, ecological, cultural or scenic resources of National, State or local significance." This was corrected in part by the Butte County Planning Commission to indicate "the proposal will definitely have a significant effect on the cultural rescources [sic] of local significance." As corrected, the draft EIR was approved by the commission on December 6, 1973.

An appeal was taken to the Butte County Board of Supervisors (hereinafter board), which held a public hearing on January 22, 1974. In response to various objections to the project from members of the public, the board referred the EIR back to the planning commission for further comments. The commission then prepared the supplemental report, which added to the archaeology portion of the draft EIR a supplemental report from Professor Boynton, dated February 4, 1974. Boynton's report reaffirmed the need for test excavations, stating "professionally-adequate assessments of impact cannot be substantiated without sub-surface reconnaissance and laboratory analysis." It further commented: "The allegation was made at the County Board of Supervisor's meeting of 23 January 1974 that many of the 'Indian mounds' had been leveled and that their arcaheological [sic] significance had been destroyed. This allegation is not, nor can it be, substantiated on the basis of negative evidence, a fact to which the original archaeological assessment addressed itself. Of the three recorded archaeological sites, one is apparently quite intact except for minor surface disturbance."

Boynton's supplemental report also noted the possible uniqueness of the sites, stating: "Archaeological sites, as fragile and non-renewable remnants of post-human lifeways, are variable as to location, composition and ecological orientation in direct relation to topographic, climatic and biotic-zone boundaries. The proposed development which is situated at the mouth of Stilson Canyon is at the contact zone between the alluvial fan/Lower-Sonoran grassland biotic zone and the Upper Sonoran/foothill biotic zone. The concentration of aboriginal cultural activity as evidenced by archaeological sites is indicative of the significance of this biotic contact-zone to the Native Americans of the area. Such a geographical and ecological situation is potentially representative of unique adaptive and subsistence-oriented activities of the prehistoric Maidu Indians for the entire 30 mile drainage of Little Chico Creek." Finally, Boynton noted that approving the project without testing "does not represent responsible environmental planning procedure," under CEQA.

The board of supervisors held another public hearing on the project on March 5, 1974. Boynton orally reiterated to the board the points made in his supplemental report. The hearing was continued to March 12, 1974, at which time Professor Keith Johnson, Chairman of the Department of Anthropology at California State University, Chico, and Boynton's superior, testified that "the archeological study would cost the developer money, but if it was not to be made, the land should be left as open space, or that certain areas should be set aside for the study." The county responded that "the E.I.R. would be amended to state that the land owner would make available sites for use of archeological studies."

The board of supervisors then adopted the EIR, including Boynton's supplemental report, and on March 19, 1974, approved the project, appending thereto a condition number 17, requiring the developer to "Set aside 3 lots for a period of six months for exploration, concerning the archeological factor."[1]

In denying plaintiff's request for a writ of mandate to reverse the board's action, the trial court ruled that the board's decision was "supported by *substantial evidence* in the light of the whole record and there has been no prejudicial abuse of discretion." (Italics in original.)

---

[1]Condition 17 appears to be somewhat clarified by a statement in the minutes of the March 5 meeting to the effect that "the sites requested will be left as they are at the present for six months to allow anyone to research them and if at the end of that time they find anything that might be helpful, the time would be extended."

The scope of review in this case is governed by Public Resources Code section 21168.5, which provides that " 'In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (See *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].)

In essence, plaintiff makes two contentions. First, it claims that since the EIR indicates a need for the conduct of further testing to accurately determine the true environmental and archaeological impact, the failure to conduct the test (at the developer's expense) per se renders the EIR inadequate. Second, it argues that the EIR is inadequate because the board failed to properly respond to and evaluate the EIR's comments concerning archaeology.[2]

I

Public Resources Code section 21100, subdivisions (a)-(g) specifies the required contents of an EIR, which include (a) the environmental impact of the proposed project, (b) adverse effects which cannot be avoided, (c) proposed mitigation measures to minimize the impact, (d) alternatives to the project, (e) the relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity, and (f) irreversible environmental changes.

The term "environment," as used in CEQA, includes "objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5.) It cannot be disputed that archaeological sites are encompassed within this inclusion. (See Pub. Resources Code, § 5097.9.) Since the true impact of the project on the archaeological potential of the area could not be fully determined without the recommended tests, and since the tests were not conducted, plaintiff concludes that the environmental impact of the project necessarily was not covered in the EIR, rendering the EIR inadequate as a matter of law.

---

[2]Plaintiff also contends that the board prejudicially abused its discretion within the meaning of Public Resources Code section 21168.5. However this contention is in actuality founded upon the other two, i.e., that the board abused its discretion because it did not require the testing and did not properly comment.

In essence, this contention advocates a rule making it mandatory for an agency to conduct every test and perform all research, study and experimentation recommended to it to determine true and full environmental impact, before it can approve a proposed project. We reject this contention, first because it is unreasonable, and second because neither the statutes (Pub. Resources Code, § 21000 et seq.) nor the guidelines of the secretary of the resources agency (Cal. Admin. Code, tit. 14, div. 6) suggest it. As above noted, the estimated cost of the testing recommended in this case was $1,900.60, a sum which arguably might not be unreasonable to assess against the real party in interest. Suppose however that the estimated cost were $100,000, or any sum the expenditure of which would make the project either impossible or unfeasible for the developer; the requirement proposed by plaintiff would then automatically eliminate the project from further consideration, irrespective of other factors.

"An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by every public agency prior to its approval or disapproval of a project. The purpose of an environmental impact report is to provide public agencies with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which any adverse effects of such a project might be minimized; and to suggest alternatives to such a report." (Pub. Resources Code, § 21061.)

"An EIR may not be used as an instrument to rationalize approval of a project, nor do indications of adverse impact, as enunciated in an EIR, require that a project be disapproved. While CEQA requires that major consideration be given to preventing environmental damage, it is recognized that public agencies have obligations to balance other public objectives, including economic and social factors in determining whether and how a project should be approved." (Cal. Admin. Code, tit. 14, § 15012. See also *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584 [122 Cal.Rptr. 100].)

Such being the purpose of the EIR (environmental information only, with discretion reserved in the agency to accept or reject it), it is totally inconsistent with the legislative objective to cease all further consideration of a project unless recommended testing is performed. Just as an agency has the discretion for good reason to approve a project which will admittedly have an adverse environmental impact, it has discretion to

reject a proposal for additional testing or experimentation. Similarly it may, again in the sound exercise of its discretion, direct that the project site be made available for a certain period for testing by persons other than the developer and at their own expense. Thus, assuming the existence of sound reason and its proper articulation in the EIR, the board here could properly have made the decision that it made.

## II

With plaintiff's second contention we agree. ■ The board did not sufficiently review, comment upon, and respond to the archaeological information, both as contained in the EIR itself and as presented to the board at hearing.

Among the CEQA guidelines (Cal. Admin. Code, tit. 14, div. 6) we note section 15146, which reads in part as follows:

"(a) The Final EIR shall consist of: (1) The Draft EIR . . . . (2) *Comments and recommendations* received on the Draft EIR either verbatim or in summary. . . . (4) *The responses* of the Lead Agency *to significant environmental points* raised in the review and consultation process.

"(b) The response of the Lead Agency to comments received may take the form of a revision of the Draft EIR or may be an attachment to the Draft EIR. *The response shall describe the disposition of significant environmental issues raised* . . . . In particular the major issues raised when the Lead Agency's position is at variance with recommendations and objections raised in the comments must be addressed *in detail* giving reasons why specific comments and suggestions were not accepted, and factors of overriding importance warranting an override of the suggestions." (Italics added.)

We note further that Butte County has a similar requirement by way of attachment to the EIR.

"The attachment shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). Major issues raised when approval of the project would be at variance with recommendations and objections raised in such comments must be addressed in detail in the attachment,

which should give reasons why specific comments and suggestions were not accepted and list factors of overriding importance warranting an override of these suggestions." (Butte County Resolution No. 73-59, § 5 T.)

In *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 841-842 [115 Cal.Rptr. 67], confronted with circumstances similar to those involved here, the court stated:

". . . in preparing the final EIR, the County must describe the disposition of each of the significant environmental issues raised and must particularly set forth in detail the reasons why the particular comments and objections were rejected . . . 'the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement "unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind" not only fails to crystallize issues [citation] but "affords no basis for comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." [Citation.] Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response.*' "[3] (Italics in original.)

Reviewing the record before us, we note that the board did not respond adequately to the adverse environmental indications presented to it. ▆ In fact, it did not really respond to them at all.[4] The proceedings following the draft EIR, including the minutes of the three board meetings of March 1974, show only the receipt of further adverse archaeological information, followed by approval of the EIR and of the subdivision without any meaningful comment thereon.

---

[3]*Burger* v. *County of Mendocino* (1975) 45 Cal.App.3d 322 [119 Cal.Rptr. 568], further demonstrates the need for adequate response to adverse environmental effects suggested by the EIR and comments thereto. *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584 [122 Cal.Rptr. 100], involves an example of an adequate response.

[4]Butte argues that at the last board meeting, the oral comments of the board members adequately answered the adverse environmental impact information, and that it was incumbent upon plaintiff to make the record of such proceedings (which are on tape) available to the trial court for review. We do not agree. The response required by California Administrative Code, title 14, section 15146, like the EIR itself, must be in writing.

The judgment is reversed, with directions to the trial court to vacate its order denying the writ and to make further disposition consistent with this opinion.

Friedman, Acting P. J., and Evans, J., concurred.