[No. F041012. Fifth Dist. Apr. 1, 2003.]

ASSOCIATION OF IRRITATED RESIDENTS et al., Plaintiffs and Appellants, v.
COUNTY OF MADERA et al., Defendants and Respondents;
DIAMOND H DAIRY et al., Real Parties in Interest.

1384

---

**COUNSEL**

Brent J. Newell, Luke W. Cole and Caroline Farrell for Plaintiffs and Appellants.

Herum Crabtree Brown, Steven A. Herum and Thomas H. Terpstra for Defendants and Respondents and for Real Parties in Interest.

---

**OPINION**

**BUCKLEY, J.—**

### INTRODUCTION

Appellants Association of Irritated Residents (AIR) and Center on Race, Poverty and the Environment (CRPE) challenge the denial of their petition

for writ of mandate (the petition) which sought to overturn the certification of a final environmental impact report (FEIR) and issuance of a conditional use permit (CUP) authorizing construction and operation of the Diamond H Dairy (the dairy).

Appellants contend that respondents County of Madera and Board of Supervisors for the County of Madera (the County) violated the California Environmental Quality Act (CEQA).[1] Specifically, they argue that the FEIR did not sufficiently study whether the dairy would adversely impact the San Joaquin kit fox and that real parties in interest (Hooker) should have been required to obtain an incidental take permit from the United States Fish and Wildlife Service (the Service) as a mitigation measure. They also contend that the FEIR did not adequately analyze the reduced-herd-size alternative and that economic evidence concerning this alternative should not have been received at the hearing on the certification of the FEIR. Finally, they argue that the FEIR did not sufficiently consider the cumulative impacts on groundwater quality resulting from development of the dairy industry in the San Joaquin water basin. As will be explained below, none of these arguments is persuasive. The FEIR fulfilled its informational function; the County satisfied the obligations imposed by CEQA. Accordingly, we will affirm the denial of the petition for writ of mandate.

FACTUAL AND PROCEDURAL BACKGROUND

Hooker applied for a CUP in July 1999 to construct the dairy on a 158-acre portion of a site consisting of approximately 1,925 acres of rural agricultural land southeast of Chowchilla (the dairy site).[2] The dairy site is located in the unincorporated area of Madera County, south of Avenue 18-1/2, west of Road 10, north of the Berenda Slough and east of the San Joaquin flood bypass. The dairy site is zoned for agricultural uses; a dairy is permitted in this zoning category and is consistent with the general plan. A portion of the dairy site is within a Williamson Act contracted agricultural preserve. The regulations for Williamson Act contracts allow dairies. The dairy site is currently being farmed in cotton, alfalfa, wheat and corn. The dairy site includes a small vineyard, an orchard, two permanent homes and two manufactured homes. Surrounding land uses are also agricultural. Alfalfa, cotton and corn are grown to the north, south and west. Almonds are grown to the east and north.

---

[1] CEQA is codified at Public Resources Code section 21000 et seq. and is implemented in California Code of Regulations, title 14, section 15000 et seq. (CEQA Guidelines).

Unless otherwise specified, all statutory references are to the Public Resources Code.

[2] There is a discrepancy in the record concerning the size of the dairy site. The draft environmental report (DEIR) states that it is 1,925 acres, while the initial study states that it is 1,943 acres and the environmental checklist states that it is 1,897 acres. We have assumed that the DEIR is correct.

The dairy will house a herd consisting of approximately 4,480 Holstein milk cows, 700 dry cows and 4,000 replacement heifers. The dairy will produce approximately 37,000 gallons of raw milk per day; processing will occur at an off-site creamery. The dairy will employ 20 people in three shifts. The owner/operator and two employees will live on site. The dairy complex will consist of eight 700-foot long freestall barns, a dairy barn, a hospital barn, commodity barns, corrals, other concrete and steel structures and hay and silage storage areas. A minimum of 14 parking spaces, a loading zone and service roads will be constructed. The facility will also include separation ponds and lagoons for waste product storage. The two manufactured homes will be removed and a new single family residence will be constructed. The dairy complex will occupy approximately 158 acres of the dairy site. The balance of the acreage will continue to be used for agricultural production; 635 acres of alfalfa and 1,000 acres of corn silage/oat silage (double cropped) or other crops with equal or greater capacity for nitrogen uptake will be grown.

An initial study was conducted. It concluded that, as mitigated, the dairy would have a less than significant impact on the environment. A mitigated negative declaration was approved by the planning commission and the board of supervisors (the board). CRPE appealed and on November 14, 2000, the board ordered preparation of an environmental impact report (EIR).

The DEIR was issued in February 2001. It concluded that the dairy would cause significant unavoidable adverse environmental effects on groundwater quality, air quality and odors.

CRPE filed a comment letter on April 11, 2001, raising, inter alia, the same issues asserted on appeal.

Public hearing concerning certification of the FEIR[3] was held on June 19, 2001. Appellants' representative spoke at the hearing. The board voted to certify the FEIR and to approve the CUP 99 to 29.

Appellants filed the petition within the statutory period.

The dairy was constructed and began operating.

Appellants motioned for issuance of a stay or preliminary injunction. The motion was denied.

The petition was heard and denied on May 17, 2002.

---

[3]The FEIR consists of the DEIR, comments and the responses to the comments. (CEQA Guidelines, § 15132.)
The contents of the FEIR will be set forth as necessary, *post.*

DISCUSSION

I. *Exhaustion*

■ We summarily reject the County's assertion that appellants did not exhaust their administrative remedies. All of the issues raised on appeal were presented by appellants to the County prior to issuance of the notice of determination. These issues were also among the many points that appellants litigated below. By these actions, appellants satisfied their obligation to exhaust administrative remedies and they preserved these issues for our review. (§ 21177, subds. (a), (b); *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 107 [99 Cal.Rptr.2d 378] (*Cadiz*).) Appellants cannot be faulted for narrowing the focus of the litigation on appeal.

II. *Standard of Review*

■ In reviewing challenges to the certification of an EIR or approval of a CUP, the court must determine whether the lead agency abused its discretion by failing to proceed in a manner required by law or by making a determination or decision that is not supported by substantial evidence. (§ 21168.5; *Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 241-242 [82 Cal.Rptr.2d 436] (*Fairview*).) "Provided the EIR complies with CEQA, the [b]oard may approve the project even if it would create significant and unmitigable impacts on the environment." (70 Cal.App.4th at p. 242.) ■ "The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375-1376 [43 Cal.Rptr.2d 170].)

■ When assessing the legal sufficiency of an EIR, the reviewing court focuses on adequacy, completeness and a good faith effort at full disclosure. (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 954 [91 Cal.Rptr.2d 66] (*Amador*).) "The EIR must contain facts and analysis, not just the bare conclusions of the agency." (*Santiago Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 831 [173 Cal.Rptr. 602].) "An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 405 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) Analysis of environmental effects need not be exhaustive, but will be judged in light of what was

reasonably feasible. When experts in a subject area dispute the conclusions reached by other experts whose studies were used in drafting the EIR, the EIR need only summarize the main points of disagreement and explain the agency's reasons for accepting one set of judgments instead of another. (CEQA Guidelines, § 15151; Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 353 (Guide to CEQA).)

A court's proper role in reviewing a challenged EIR is not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an information document. (*Laurel Heights, supra,* 47 Cal.3d at p. 407.) Substantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a); *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704] (*Raptor*).)

 As frequently occurs, many of the disputes in this case center on the question whether relevant information was omitted from the FEIR. Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. (§ 21005, subd. (b).) This court has previously explained, "[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650] (*Farm Bureau*); see also *Raptor, supra,* 27 Cal.App.4th at p. 722.) Numerous authorities have followed and applied this prejudice standard. (See, e.g., *Cadiz, supra,* 83 Cal.App.4th at p. 95; *Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 492 [82 Cal.Rptr.2d 705]; *Amador, supra,* 76 Cal.App.4th at p. 946; *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 730 [12 Cal.Rptr.2d 785].)

Recently, in *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215 [32 Cal.Rptr.2d 19, 876 P.2d 505] (*Sierra Club*), our Supreme Court found that the omission of information about four old-growth dependent species on the project site from a timber harvest plan (the functional equivalent of an EIR; see *id.* at p. 1230) frustrated the purpose of the public comment provisions of the Forest Practice Act and made meaningful identification and assessment of the potentially significant environmental impacts of the harvest plan impossible. It declared that the board had not "proceed[ed] as

required by law" (*id.* at p. 1236) and that "[i]n these circumstances prejudice is presumed." (*Id.* at p. 1237.)

The County calls attention to two recent cases that appear to deviate from this established prejudice standard, *Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609 [45 Cal.Rptr.2d 688] (*Barthelemy*), and *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341 [84 Cal.Rptr.2d 563] (*National Parks*), and urges us to follow their lead. To the extent that these cases reject the standard of review we applied in *Farm Bureau* and *Raptor*, by stating that claims that information has been omitted from an EIR essentially should be treated as inquiries whether there is "substantial evidence to support [the] decision to approve the project" (*National Parks, supra,* 71 Cal.App.4th at p. 1353; see also *Barthelemy, supra*, 38 Cal.App.4th at pp. 1620-1621), we find them unsound. These two decisions fail to acknowledge the important public informational purpose that EIR's serve. An EIR is an educational tool not just for the decisionmaker, but for the public as well. It is a document of accountability, "an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 392.) It is for this reason that CEQA's investigatory and disclosure requirements must be carefully guarded. "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights, supra,* 47 Cal.3d at p. 392.) Moreover, these two decisions failed to take into account subdivision (a) of section 21005. This section provides that "noncompliance with the information disclosure provisions of this division which precludes relevant information from being presented to the public agency . . . may constitute a prejudicial abuse of discretion . . . , *regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.*" (*Ibid.,* italics added; see also *Amador, supra,* 76 Cal.App.4th at p. 946.) Thus, the existence of substantial evidence supporting the agency's ultimate decision on a disputed issue is not relevant when one is assessing a violation of the information disclosure provisions of CEQA. Accordingly, we continue to adhere to the standard of review set forth in *Farm Bureau, supra,* 221 Cal.App.3d 692, and *Raptor, supra,* 27 Cal.App.4th 713, and impliedly endorsed in *Sierra Club, supra,* 7 Cal 4th 1215.

III. *Biological Resources—Kit Fox*

 A. *Facts*

 Before the County prepared the initial study, it sent the California State Department of Fish and Game (Fish and Game) a copy of Hooker's application for a CUP and requested its review and comment. Fish and Game responded in writing on August 13, 1999. In relevant part, it stated that it, "is not aware of any occurrences of listed or sensitive species on the Project site, however specific surveys have not been conducted to determine presence or absence of wildlife resources on the site." Fish and Game then wrote that, "it may be necessary for a qualified biologist" to determine the location and extent of sensitive resources and habitats on the project site.

 Kimberly E. Duncan and Kacy L. O'Malley are biologists employed by Quad Knopf. Quad Knopf prepared the environmental documentation for this project. On February 24, 2000, they conducted a reconnaissance level biological field survey (the field survey) on the dairy site by driving the existing roadways and by walking portions of the alfalfa field perimeters to identify the potential presence of special status plant and animal species or their sign. Prior to conducting the field survey, the Natural Diversity Data Base (NDDB) maintained by Fish and Game was queried to determine whether sensitive species have been previously reported on or near the dairy site. The NDDB indicated that five special status animal species, four special status plant species, and two natural vegetation communities have been reported in areas near the proposed project locations. The special status animals included the Swainson's hawk, the blunt-nosed leopard lizard, the giant garter snake and the San Joaquin kit fox. The special status plants included the heartscale, the brittlescale and the lesser saltscale. The natural vegetation communities are the valley sacaton grassland and the valley sink scrub.

 After conducting the field survey, Duncan prepared a report dated March 10, 2000, detailing the findings (the biological report). Duncan wrote that she did not observe any special status plant or animal species and that the dairy site does not support habitat for any special status species. She specifically noted that no kit foxes or their sign were observed on the dairy site. However, alfalfa fields on the dairy site can provide foraging habitat for raptor or carnivore species such as Swainson's hawk and the kit fox, provided suitable prey species such as ground squirrels, rats and mice are present. She observed ground squirrel burrows on the perimeter of the property and along the canal banks. Duncan concluded that if improvement

of the area in and along irrigation canals and the Chowchilla Canal is avoided and alfalfa fields remain to provide foraging areas, "no significant impacts to threatened or endangered species or their habitats are expected as a result of this project." Furthermore, implementation of the proposed dairy will not result in a significant impact to migratory corridors or nursery sites.

The biological resources section of the DEIR is based entirely on the biological report. It repeats the biological report virtually verbatim. The DEIR concluded that because alfalfa fields will remain on the dairy site and the closest distance between the proposed dairy facilities and the abandoned Chowchilla Canal is 200 feet, the impacts to threatened or endangered species and their habitats are less than significant with mitigation.

Fish and Game did not comment on the DEIR. However, CRPE and the Service each commented on this section of the DEIR. CRPE's comment stated that the DEIR's conclusion that biological resources would not be significantly impacted by the dairy lacks substantial evidence because the field study did not follow survey guidelines for sensitive species that were issued by Fish and Game to determine the presence of state listed species. It asserted that County was required to conduct a protocol level study that complied with the survey guidelines. CRPE attached a copy of the survey guidelines to its comment letter. The section of the survey guidelines discussing kit fox describes three different methods to detect the presence of kit fox; a field survey is not one of these methods. CRPE also attached a letter authored by George D. Noakes, regional manager of region 4, Fish and Game. The letter is dated May 8, 1990. It is addressed to an unnamed "Sensitive Species Surveyor." Therein, Noakes states that these standardized methodologies were developed to provide minimum acceptable standards for surveys designed to determine the presence of state listed species and that all project specific surveys conducted after June 15, 1990 should use these methodologies.

In its comment letter, the Service stated that the dairy site provides "foraging habitat and a travel corridor" for kit foxes. The dairy site has been identified in the Recovery Plan for Upland Species of the San Joaquin Valley (Recovery Plan) as an important linkage area for kit foxes migrating between populations. Therefore, the Service has concluded that construction of dairy facilities will result in "the take of at least 158 acres of kit fox habitat." The Service may issue an incidental take permit under the Endangered Species Act after the applicant completes a satisfactory conservation plan. The Service requested that the following mitigation measure be added to the FEIR: " 'Through consultation with [the Service], the applicant will

avoid and minimize project impacts to federally listed species and provide compensation for any loss of habitat associated with the construction of all [dairy improvements] that impede the movement of the kit fox.' "

The response to CRPE's comment acknowledged that the initial field work was completed for a mitigated negative declaration and was subsequently incorporated into the DEIR. It then stated that "during the field survey, no sign of threatened or endangered species was observed, nor was habitat typically associated with these species present. That was the basis for concluding that protocol surveys were not indicated at that time." It continued, "[r]egardless whether protocol studies were conducted, the fact remains that no quality natural habitat is present on the site." However, "no one is refuting the possibility that San Joaquin kit fox could utilize the area for foraging or possibly a corridor to other areas." Yet, the dairy is unlikely to adversely impact or result in a kit fox "take" for three reasons. First, the NDDB indicates only one recorded observance of a pair of kit foxes approximately eight miles south of the dairy site in 1990 in a large tract of native land. Second, the dairy will remove only approximately 8.2 percent of the site acreage from cultivation and this percentage is further reduced when compared to the remaining alfalfa and other agricultural fields in the area surrounding the dairy site. Finally, the applicant will have the responsibility of complying with all applicable laws pertaining to the protection of threatened or endangered species including, but not limited to, the California Endangered Species Act and the federal Endangered Species Act.

In relevant part, the response to the Service's comment states that the Recovery Plan is not site specific. "The issue is whether project activities, most of which constitute no change from existing agricultural conditions, would result in 'take' of San Joaquin kit fox within the meaning of the Endangered Species Act. Modification of habitat alone does not constitute 'take,' according to well-established legal precedent." Nonetheless, to ensure compliance with the Endangered Species Act, the following mitigation measure is added: "The applicant shall be responsible for compliance with the requirements of the Endangered Species Act, including obtaining an incidental take permit, if it is determined that 'take' will occur."[4]

The board found the FEIR's analysis of biological resources to be adequate. It found that a protocol level study was not required due to the lack

---

[4]The Service submitted a written response to the FEIR, dated June 21, 2002. However, the hearing to certify the FEIR had been held two days earlier, on June 19. The County did not respond to the Service's June 21 letter. This did not violate CEQA because the Service's June 21 letter was dated after closure of the public comment period and responses are not required to late comments. (CEQA Guidelines, § 15207.)

of suitable habitat on the dairy site and the results of the NDDB query. It found that mitigation measure 3.3.1 will mitigate any impact on wildlife to insignificance.

### B. *Discussion*

■ Appellants argue that because County did not conduct a protocol level study following one of the three survey guideline methodologies, the record does not contain substantial evidence supporting the board's finding that the dairy will not have a substantial adverse impact on the kit fox. In other words, the field study is not substantial evidence. Implicit in this argument is the foundational assumption that CEQA compels compliance with the survey guidelines as a matter of law. We reject this argument because appellants' foundational premise is flawed. The survey guidelines are not codified in the Public Resources Code, the Fish and Game Code or the California Code of Regulations; they are not posted on the Web site maintained by Fish and Game (<www.dfg.ca.gov/org> [as of Apr. 1, 2003]). Appellants did not even proffer a foundation establishing that the survey guidelines are still in effect in western Madera County. Appellants also did not establish that the survey guidelines were meant to be applied in cases where a reconnaissance level study did not detect either quality natural habitat or any sign of the species. In addition, we find it notable that Fish and Game did not reference the survey guidelines when the agency responded to County's request for comment about this specific project in August 1999. Rather, Fish and Game simply stated that "a qualified biologist" may need to determine whether sensitive species were on the project site. Duncan and O'Malley, qualified biologists, did so. Moreover, Fish and Game did not comment on the DEIR and the Service did not challenge the propriety of the methodology utilized to survey for the presence of sensitive species in its comment. The County was not required to conduct a protocol level study merely because CRPE requested it in its comment. CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project. The fact that additional studies might be helpful does not mean that they are required. (CEQA Guidelines, § 15204, subd. (a); *Cadiz, supra,* 83 Cal.App.4th at p. 102; *Society for California Archaeology v. County of Butte* (1977) 65 Cal.App.3d 832, 838-839 [135 Cal.Rptr. 679].) The agency has discretion to reject a proposal for additional testing or experimentation. (*Cadiz, supra,* 83 Cal.App.4th at p. 102.) The response to CRPE's comment adequately explains why a protocol level study in conformity with the survey guidelines was not conducted; no quality natural habitat was present on the site, no sensitive species or their sign was detected during the field survey

and the NDDB query showed only one kit fox sighting a decade ago and it was over eight miles south of the dairy site. For these many reasons, we conclude that appellants have not shown that CEQA required use of the survey guidelines in this instance. The biological report (which discusses the field survey, the NDDB query, and the conclusions Duncan reached from this data) constitutes substantial evidence supporting the determination reached in the FEIR and the finding adopted by the board that, as mitigated, the dairy will not significantly affect the kit fox.

Appellants also argue that CEQA required the County to compel Hooker to obtain an incidental take permit. Again, we disagree. CEQA neither requires a lead agency to reach a legal conclusion regarding "take" of an endangered species nor compels an agency to demand an applicant to obtain an incidental take permit from another agency. The finding that the dairy would not significantly impact biological resources did not limit the federal government's jurisdiction under the Endangered Species Act or impair its ability to enforce the provisions of this statute. It is not precluded from declaring that a "take" has occurred and requiring Hooker to obtain an incidental take permit. Mitigation measure 3.3.2 requiring Hooker to obtain an incidental take permit from the Service if the Service determines that kit fox "take" has occurred adequately ensures compliance with the provisions of the Endangered Species Act. The response to the Service's comment explains why County concluded that a "take" had not occurred and that the dairy would not adversely affect the kit fox. Disagreements on an issue do not compel invalidation of an EIR; the board was free to reject the Service's position on the "take" issue. When the evidence on an issue conflicts, the decisionmaker is "permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others." (*Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 413 [200 Cal.Rptr. 237] (*Greenebaum*).)

Finally, appellants argue that the FEIR did not sufficiently analyze whether the dairy would have a significant adverse effect on the kit fox. Again, we disagree. Contrary to the assertion of appellants, "an EIR need not include all information available on a subject." (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 748 [22 Cal.Rptr.2d 618] (*Boat Shop*).) Although the biological resources section of the FEIR is brief, it contains sufficient information and analysis to enable the public to discern the analytic route the agency traveled from evidence to action. The FEIR explains that the dairy site has been in agricultural cultivation for many years and does not contain quality natural habitat. No kit fox or their sign was observed on the dairy site. The NDDB query

revealed that there had only been one kit fox sighting in the vicinity since 1990 and this sighting occurred eight miles away in a large tract of native land. Thus, it is likely that kit foxes do not frequent the dairy site. If kit foxes do utilize the dairy site, they only forage in the alfalfa fields and use the Chowchilla Canal and field perimeters as a travel corridor. Furthermore, if kit foxes do utilize the dairy site, any adverse impacts on their behavior patterns can be mitigated to insignificant for two reasons. First, the dairy will retain all but 8.2 percent of the current alfalfa fields. Second, dairy improvements will be set back 200 feet from the Chowchilla Canal, which will maintain a travel corridor for giant garter snakes, kit fox prey species and kit foxes.[5] While there were differing opinions on the issue of whether the dairy would impact the kit fox and whether the mitigation measure would be effective, the board was entitled to choose to believe one side more than the other. (*Greenebaum, supra,* 153 Cal.App.3d at p. 413.) Appellants disagree with the analysis and conclusions reached in the FEIR. Yet, this does not render the FEIR legally insufficient. "CEQA simply requires that the public and public agencies be presented with adequate information to ensure that 'decisions be informed, and therefore balanced.'" (*Boat Shop, supra,* 18 Cal.App.4th at p. 748.) The information in the FEIR meets this standard.

We reject appellants' comparison of this case to *Sierra Club, supra,* 7 Cal.4th 1215. In *Sierra Club,* the lead agency refused to conduct any study of the four species at issue. Here, a biologist first queried the NDDB to identify possible sensitive species that may be present on the dairy site, then conducted a field study, after which she analyzed her findings and prepared a written report. The public had sufficient information to comment on and reach an informed conclusion concerning the dairy's possible effect on biological resources, including the kit fox. Thus, *Sierra Club* is inapposite.

IV. *Reduced Herd Alternative*

A. *Facts*

As one of the alternatives to the proposed dairy, the EIR analyzed a reduced herd consisting of 833 milking cows, with proportionate decreases in support stock to 130 dry cows and 744 heifers. The dairy facilities would be reduced proportionally to the herd size reduction. In the executive summary, the DEIR stated that the reduced-herd-size alternative would offer

---

[5]This latter point about the travel corridor could have been better explained in the FEIR. However, EIR's are not judged on a standard of perfection but on a good faith effort at full disclosure. (CEQA Guidelines, § 15151; see, e.g., *Boat Shop, supra,* 18 Cal.App.4th at p. 749.)

a "roughly proportional reduction in air quality impacts and potential water quality impacts, while only partially meeting the project objective." The DEIR explained that adoption of this alternative would "reduce ozone precursor levels to less than 10 tons per year. However, methane, ammonia, hydrogen sulfide odor emissions, cumulative reactive organic gasses, cumulative $PM_{10}$, and cumulative methane, ammonia, and hydrogen sulfide impacts would remain significant." Furthermore, "[t]he potential for water quality impacts would remain significant at both the project and cumulative level." "The reduced herd size alternative causes fewer air and water quality impacts than the proposed project, in proportion to the amount of reduction in such herd size, as described, and would be the environmentally superior alternative after the No Project Alternatives. However, to the extent of such herd size reduction, it does not achieve the project objective, and potential water quality impacts and air quality impacts would remain significant."

CRPE's comment letter asserted that the reduced-herd-size alternative can meet the project objective of producing high quality raw milk.

The response to CRPE's comment states that the DEIR concluded that the no project and the reduced-herd-size alternative both have fewer environmental impacts than the proposed dairy and are environmentally superior. However, economic feasibility is implicit in the project objective. The CUP application states that the dairy will be in the business of producing raw milk for an off-site processor. The response then states, "While a reduced herd size would unarguably reduce impacts and by doing so may meet the County's objectives, it might not achieve the applicant's business objectives of providing a livelihood for the owner/manager and his future employees. Additional information regarding project objectives and the reduced herd size alternative may be presented by the applicant at the public hearing on the [CUP]."

Foster Farms Dairy (Foster Farms) and Hillmar Cheese Company (Hillmar) submitted letters to the board urging approval of the dairy as proposed because demand for their products has increased dramatically in recent years and it is an ongoing challenge to maintain an adequate supply of high quality milk.

Greg Hooker testified at the hearing on the FEIR. He presented an economic analysis demonstrating a negative economic return on the reduced-herd size alternative. He also presented a letter from the lending institution that was financing construction of the dairy, Yosemite Farm Credit (the lender). The lender wrote that the reduced-herd-size alternative would not be

economically feasible because it would not "generate enough cash flow to service debt on the startup operation," and that it would not finance construction of the dairy if the reduced-herd-size alternative were adopted.

The board rejected the reduced-herd-size alternative because it found that it was not economically feasible and would not achieve the basic objective of the project. This finding was based on Greg Hooker's testimony, the economic analysis, the lender's letter and the letters submitted by Foster Farms and Hillmar.

### B. *Discussion*

■ An EIR must "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (CEQA Guidelines, § 15126.6, subd. (a).) It must contain "sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project." (CEQA Guidelines, § 15126.6, subd. (d).) "The statutory requirements for consideration of alternatives must be judged against a rule of reason." (*Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910 [165 Cal.Rptr. 401].)

■ Appellants' challenge to the sufficiency of the FEIR's analysis of the reduced-herd-size alternative is unconvincing. The FEIR explained that this alternative was environmentally superior to the proposed dairy because it offered proportionate reduction in air quality impacts and potential impacts on water quality. However, it also recognized that this alternative would not fully meet the project objective because a smaller herd would produce less milk and producing milk is the fundamental objective of the project. It also recognized that the smaller herd size may not be economically viable, although it did not make a determination on this issue. This discussion is sufficient to permit meaningful evaluation of the reduced-herd-size alternative and comparison with the proposed dairy and thus complied with CEQA. Appellants' comparison to *Raptor, supra,* 27 Cal.App.4th 713 is unconvincing. In *Raptor,* the agency did not even identify a reasonable range of alternative sites or project alternatives. (*Id.* at p. 736.)

We reject as specious appellants' contention that the DEIR should have explicitly stated in its project objective that Hooker intended to produce milk

for an off-site processor *for profit*; it is assumed in a capitalistic society that one is motivated by a desire for economic return on one's labor and investment. The DEIR stated that the project under consideration was a dairy. A dairy is generally understood to be a profit-based business venture.

Appellants also argue that the economic evidence the board relied on to reject the reduced-herd-size alternative should have been included in the FEIR and that Hooker should not have been permitted to submit it at the hearing. We disagree. First, CEQA Guidelines section 15131 provides that economic data is not required to be included in an EIR. Second, section 21081.5 states that a finding of infeasibility shall be based "on substantial evidence in the record." Subdivision (e) of section 21167.6 provides that the record of the proceedings consists of many different types of materials, not just the EIR. It follows that presentation of economic evidence at the hearing was not improper.

Finally, the board's rejection of the reduced-herd-size alternative is supported by substantial evidence. Economic viability is a factor that may be considered when assessing the feasibility of alternatives. (CEQA Guidelines, § 15126.6, subd. (f)(1).) In *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 575, footnote 7 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*), the high court upheld the agency's determination that an alternative site was infeasible based on an economic analysis showing that the site could not support a version of the project large enough to be economically viable. Here, the lender's letter and the economic analysis constitute substantial evidence supporting the board's finding that the reduced-herd-size alternative is not economically feasible; elimination of all profit and loss of construction financing adequately proves that the reduced-herd-size alternative is not viable. (*Ibid.*; Guide to CEQA, *supra*, at p. 326.)

V. *Related Projects' Cumulative Effect on Groundwater Quality*

A. *Facts*

The initial discussion of water quality issues is contained in the body of the DEIR and in appendices H (a geological/hydrological report analyzing existing water conditions), I (nutrient management plan) and J (water quality impacts analysis). The most crucial mitigation measures recommended in the DEIR and the water quality impacts analysis are construction of clay-lined separation ponds and lagoons for waste product storage, groundwater and soil monitoring and use of the nutrient management plan. Implementation of

the nutrient management plan will balance the nitrogen and salinity levels of the soil. Dry manure will be scraped from corrals at least twice per year and spread on surrounding crop land. The irrigation system will have complete recovery capability. Yet, separation ponds and lagoons can leak and cause groundwater contamination. This contamination can be significant if nitrate levels exceed 45 milligrams per liter, "even though degradation did not extend laterally or downward to a sufficient extent to impact domestic well supplies." Furthermore, manure might be sold by the dairy for off-site usage and may be applied by the off-site user in a way that can cause excessive salt or nitrogen concentrations off-site. For these reasons, the dairy's effect on water quality is potentially significant despite mitigation.

Because the DEIR concluded that the dairy potentially could have an adverse effect on groundwater quality, CEQA required consideration of potential cumulative water quality impacts. Accordingly, the DEIR included a table of San Joaquin Valley dairy industry projections and a two-and-one-half-page discussion of the water quality impacts associated with development of the dairy industry that could be cumulatively significant. The DEIR stated that while nitrogen contamination could "conceivably occur," this is unlikely because nitrogen loading is not necessarily cumulative due to the direction and rate of groundwater flow and recharge and interception. Furthermore, because of these same factors, only dairies within a mile or less from each other would possibly have a cumulative impact on groundwater quality. Separation between confined animal facilities and the requirements imposed by the Regional Water Quality Control Board further minimize the likelihood of cumulative water impacts. "In a small, closed, water basin with closely spaced dairies without effective mitigation measures, such a cumulative impact could occur. In a water basin the size of the San Joaquin Basin, with modern dairy facilities and operations, designed in accord with Regional Water Quality Control Board regulations, such a cumulative impact is theoretically possible, but must be deemed unlikely." For these reasons, cumulative impacts are probably limited to an increase in groundwater salinity.

CRPE's comment letter challenged the sufficiency of the DEIR's analysis of the dairy industry's potential cumulative impacts on groundwater quality and resultant diseases. It submitted, inter alia, a 1990 study entitled Dairies and their Relationship to Water Quality Problems in the Chino Basin, California (Chino Study).

The response stated that the DEIR had acknowledged that there is a limited potential for cumulative groundwater contamination due to dairy

development in the San Joaquin basin. However, adverse health impacts resulting from groundwater contamination are far more likely to occur at the project level than as cumulative impacts. The Chino Study is not relevant to the San Joaquin Valley because the animal unit concentration in the Chino basin was 7,260 milk cows per square mile; the projected concentration in the San Joaquin Valley is only 73 milk cows per square mile.

The board found the FEIR's cumulative impacts analysis to be adequate and CRPE's "evidence" irrelevant. It also found that the dairy may have a potentially significant impact on groundwater quality and it adopted a statement of overriding considerations. It adopted all of the mitigation measures identified in the DEIR relating to groundwater quality.

B. *Discussion*

■ Appellants contend that the FEIR's discussion of related projects' cumulative effects on groundwater quality is insufficient because it "made only conclusory statements and assertions unsupported by facts or analysis." Once again, we are not persuaded. The FEIR's discussion of the potential cumulative impacts of related dairy projects on groundwater quality satisfies CEQA.

"The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonable foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (CEQA Guidelines, § 15355, subd. (b).) "Cumulative impact analysis 'assesses cumulative damage as a whole greater than the sum of its parts.' " (Guide to CEQA, *supra*, at p. 465.) "Guidelines section 15130, subdivision (b) provides that '[t]he discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness.' . . . [A] good faith and reasonable disclosure of such impacts is sufficient." (*Fairview, supra,* 70 Cal.App.4th at p. 245.)

The FEIR provided sufficient information for the public to evaluate the likely impacts on groundwater quality in the San Joaquin basin resulting from development of the dairy industry. The conclusions concerning salinity and nitrogen loading are supported by adequate analysis and factual detail. The DEIR explained why nitrogen loading is not likely to be a cumulative

problem. The agency was not required to provide evidence supporting every fact contained in this section. The response answered CRPE's assertion that the DEIR had ignored the potential health impacts of groundwater contamination by replying that pathogens and bacteria from manure were more likely to affect the groundwater at a given project site rather than to have a synergistic effect on the groundwater supply, and by pointing out that there are no public water supplies within approximately 10 miles of the project site. It also explained why the Chino Study is not relevant to the San Joaquin Valley water basin. This discussion of cumulative impacts satisfies CEQA. (*Cadiz, supra,* 83 Cal.App.4th at p. 110; *Fairview, supra,* 70 Cal.App.4th at pp. 245-246; *Boat Shop, supra,* 18 Cal.App.4th at pp. 749-750.) Appellants' argument to the contrary is premised on the mistaken position that the cumulative impacts section of an EIR must be as detailed as the consideration of the proposed project itself. This is incorrect. (CEQA Guidelines, § 15130, subd. (b).) Recent decisions demonstrate that exhaustive analysis is not required. (*Cadiz, supra,* 83 Cal.App.4th at p. 110; *Fairview, supra,* 70 Cal.App.4th at pp. 745-746; *Boat Shop, supra,* 18 Cal.App.4th at pp. 749-750.)

Appellants' reliance on *Farm Bureau, supra,* 221 Cal.App.3d 692 is misplaced. The cumulative impacts section of the EIR in *Farm Bureau* did not contain a list of "the projects considered, no information regarding their expected impacts on groundwater resources and no analysis of the cumulative impacts. It merely assumes whatever impacts such projects may have will be mitigated by existing and planned water conservation efforts of governmental agencies in the area." (*Id.* at p. 729.) In contrast here, the FEIR contains a summary of dairy industry projections. It sets forth the possible cumulative impacts on groundwater resources and then analyzes the likelihood of the actual occurrence of such impacts.

## CONCLUSION

This rebuke, originally issued by the Supreme Court in a case where appellants had mounted a lengthy effort to halt construction of a resort hotel on property that had a long history of industrial use, also applies here: "The wisdom of approving this or any other development project, a delicate task which requires a balancing of interests, is necessarily left to the sound discretion of the local officials and their constituents who are responsible for such decisions. The law as we interpret and apply it simply requires that those decisions be informed, and therefore balanced. Concurrently, we caution that rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Goleta Valley, supra,* 52 Cal.3d at p. 576.)

### DISPOSITION

The motion to augment the record is granted. The order denying the petition for writ of mandate is affirmed. Costs are awarded to respondents and real parties in interest.

Vartabedian, Acting P. J., and Levy, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 23, 2003. Brown, J., did not participate therein.