Filed 11/14/22; certified for publication 12/13/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAVE NORTH PETALUMA RIVER AND WETLANDS et al.,<br><br>    Petitioners and Appellants,<br><br>v.<br><br>CITY OF PETALUMA et al.,<br><br>    Respondents,<br><br><br>J. CYRIL JOHNSON INVESTMENT CORPORATION,<br><br>    Respondent and Real Party in Interest. | A163192<br><br>(Sonoma County<br>Super. Ct. No. SCV-266157) |

This is a mandate proceeding to review an agency's decision for compliance with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.[1])  At issue is the decision of the City of Petaluma (the City) to certify the environmental impact report (EIR) for a 180-unit apartment complex in Petaluma proposed by real party in interest J. Cyril Johnson Investment Corporation (JCJIC).  Save North Petaluma River

---

[1]    All further statutory references are to this code unless otherwise indicated.

1

and Wetlands and Beverly Alexander (petitioners) appeal the trial court's decision upholding the City's certification of the EIR. We shall affirm.

## Factual and Procedural Background

In 2003, JCJIC proposed the development of a 312-unit apartment complex called the "Sid Commons Apartment Project," which would be located in Petaluma on roughly 15.45 acres of vacant land along the Petaluma River at the northern end of Graylawn Avenue (the Project). The site of the Project includes grasses, wetlands, oaks, and other vegetation. In July 2007, the City published the "Notice of Preparation" for the Project. The environmental consultant expected that a Draft EIR could be completed in approximately five months.

In May 2008, shortly after the City began work on the Draft EIR, the City adopted General Plan 2025.[2] To conform to General Plan 2025, JCJIC submitted its Project application as a smaller 278-unit complex and also revised the Project to include river terracing.

In October 2015, the City began meeting with regulatory agencies to solicit their input on the Project. After conducting site visits, the California Department of Fish and Wildlife, the Regional Water Quality Control Board, and the National Oceanic and Atmospheric Administration Fisheries Service

---

[2] General Plan 2025 included the following revisions to the previous General Plan: (1) increase of the allowable residential density at the site; (2) addition of Policy 1-P-2, providing for infill development at equal or higher density and intensity than surrounding uses; (3) addition of the Project Site to the Land Inventory of Opportunity Sites in the Housing Element of the General Plan; (4) addition of Policy 8-P-30, which requires the set back of new development at least 200 feet from the centerline of the Petaluma River; and (5) addition of Policy 8-P-28, which called for the " 'construction of a flood terrace system to allow the [Petaluma] River to accommodate a 100-year storm event within a modified River channel, to the extent feasible given existing physical and natural constraints.' "

all provided feedback on the issues they believed the EIR should address.  In view of General Plan 2025 and the agency feedback, a "Habitat Mitigation Monitoring Plan" was created in order to:  address habitat replacement and mitigation for impacts caused by the general plan's requirement for river terracing; preserve existing native riparian " 'high value' " habitat where practicable; increase the acreage of aquatic habitat within the Project site; increase the functions and values of the existing habitat; and improve flood capacity of the Petaluma River.  The monitoring plan was incorporated into the "Biological Resources" chapter of the Draft EIR.

On March 1, 2018, the City published the Draft EIR for public review and comment.  JCJIC provided various consultant studies regarding environmental impacts, including a March 2004 report by Wetlands Research Associates, Inc. (WRA) of so-called "Special Status Species" (the 2004 WRA Special Status Species Report or the 2004 WRA Report).  In April 2018, the Planning Commission considered the Draft EIR and took public comment that included concerns from neighboring residents regarding traffic impacts to Graylawn Avenue and neighboring streets, impacts to the floodplain, and decreased quality of life for the neighborhood.  The commission provided feedback on the Draft EIR and offered comments to address the intense density of the Project and to provide for an appropriate buffer between the Project and the riparian corridor.

On May 21, 2018, the City Council held a hearing on the Draft EIR. City staff and the EIR consultant presented the Draft EIR, summarized the public comment, and reported on the outcome of the Planning Commission hearing.  The council considered the public comment, which reiterated concerns about the impact of increased traffic on neighboring streets and decreased quality of life for the neighborhood.  Commenters were also

3

concerned about impacts to flooding, the floodplain, hydrology, wetlands, the Petaluma River, wildlife, trees, and access to the proposed river trail. City Council members provided comment and requested supplemental documentation, noting concerns about the hydrology analysis, noise modeling, and traffic data. Although the council authorized preparation of a final EIR, a majority of its members expressed a preference for a refined concept that would reduce density, minimize traffic impacts, provide an enhanced buffer between the proposed development and the riparian corridor, and minimize impacts to mature trees and wetland features.

In October 2019, the City issued its "Response to Comments/Final Environmental Impact Report" (Final EIR). In response to the significant environmental conclusions raised in the Draft EIR and the comments from public agencies and the public, JCJIC proposed a revised version of the Project that would further reduce the proposed complex from 278 units to 205 units; reduce the height of certain residential buildings from three to two stories; increase building setback from the Petaluma River; and implement a "Traffic Calming Plan" on Graylawn and Jess Avenues. The Final EIR analyzed these revisions and concluded they eliminated or reduced several of the potential significant impacts identified in the Draft EIR for the original plan. Although the Planning Commission voted to recommend that the City Council certify the EIR, it did not recommend approval of necessary zoning amendments.

On January 8, 2020, JCJIC submitted another reduced version of the Project with 180 units in mostly three-story buildings except for the two-story buildings in the areas adjacent to existing single-family homes (the Second

4

Revision).[3]  Among other things, these changes were intended to reduce the building footprint and increase the setback from the Petaluma River; preserve two wetlands near the river and avoid development in the River Plan Corridor; and preserve additional trees with a flood terrace design adjustment.  The changes would also reduce flood impacts and result in a further 12 percent reduction in vehicle trips.

On February 3, 2020, the City Council held a hearing on whether to certify the EIR based on the Second Revision and approve the zoning amendments.  A City staff memo prepared for this hearing thoroughly detailed the history of the Project, including the Planning Commission's consideration of the Final EIR and JCJIC's appeal of the commission's denial of the proposed zoning amendments; the comments received on the Draft and Final EIRs; the extent of JCJIC's public outreach to better understand and respond to neighborhood concerns; and the multiple revisions JCJIC made to the Project in response to comments.  The staff report concluded that the changes in the Second Revision reduced impacts, reduced conflicts regarding tree protection and wetlands preservation, and addressed the concerns that had caused the Planning Commission to deny the zoning amendments.  It also noted the Second Revision was within the range of alternatives addressed in the EIR and would not result in new or more substantial impacts compared to prior versions.

Meanwhile, earlier that afternoon, petitioners submitted a letter to the City Council challenging numerous aspects of the Project's CEQA review.  As relevant here, petitioners disputed the adequacy of the EIR's special status

---

[3]     The Project site could have accommodated up to 282 units under the Land Inventory referenced in the revised General Plan.

species analysis and challenged the EIR's failure to analyze emergency evacuations.

After several hours of deliberation and public comment, the City Council voted to certify the EIR and to overturn the Planning Commission's denial of zoning amendments. The council subsequently approved the zoning amendments by ordinance on February 24, 2020.

Petitioners filed a petition for writ of mandate challenging the adequacy of the EIR on a number of grounds, including the two raised here. The trial court held a hearing and thereafter denied the petition in a detailed 45-page decision. After entry of judgment, petitioners timely appealed.

## Discussion

### A. CEQA Standard of Review

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) "With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).) The fundamental purpose of an EIR is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061.) As such, the EIR is an informational document that functions as "the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' (§ 21001, subd. (a).)" (*Laurel Heights*, at

6

p. 392; see generally Guidelines, § 15003, subd. (a)[4] ["EIR requirement is the heart of CEQA"].)

The EIR serves as a "document of accountability" because it requires certification or rejection by the responsible public officials. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees." (*Ibid*.) Although perfection in preparing the EIR is not required, the agency must reasonably and in good faith discuss a project in detail sufficient to enable the public to discern the " 'analytic route' " that the " 'agency traveled from evidence to action.' " (*Id*. at p. 404; see Guidelines, § 15151; *San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 614.)

In a mandate proceeding to review an agency's decision for compliance with CEQA, our role is to determine the EIR's sufficiency as an informative document; we do not pass upon the correctness of the agency's environmental determinations. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) Like the trial court, we "review the administrative record to determine whether the agency prejudicially abused its discretion." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116–117 (*Save Our Peninsula*).) For purposes of CEQA, an abuse of discretion "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

---

[4]     All references to "Guidelines" are to the state CEQA Guidelines, which implement the provisions of CEQA and are set forth in the California Code of Regulations, title 14, section 15000 et seq.

(§ 21168.5; see *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236.)

CEQA regulations define substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Whether a fair argument can be made requires an examination of "the whole record before the lead agency." (*Ibid*.) Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts" (Guidelines, § 15384, subd. (b)), but cannot be established by "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment" (Guidelines, § 15384, subd. (a)).

The substantial evidence standard requires that we " 'resolve reasonable doubts in favor of the administrative finding and decision' " and refrain from weighing conflicting evidence and second guessing agency determinations that a project's adverse effects are or are not sufficiently mitigated. (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 392–393.) It is the burden of the project opponents to prove the EIR is legally inadequate. (*Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 117.)

On appeal, petitioners contend the trial court erred and abused its discretion in upholding the City's certification of the EIR because, in their view, the EIR failed to properly analyze the Project's impacts on special status species and on public safety in the event of an evacuation. We address these claims in order.

8

## B. The EIR Properly Analyzed Impacts to Special Status Species

CEQA regulations contemplate that the physical conditions existing when a Notice of Preparation is published "will normally constitute the baseline physical conditions" used to describe the environmental setting and to determine the significant effects of a proposed project. (Guidelines, § 15125, subd. (a).) Knowledge of the baseline conditions is "critical to the assessment of environmental impacts," and special emphasis is "placed on environmental resources that are rare or unique to that region and would be affected by the project." (Guidelines, § 15125, subd. (c).) When an EIR contains an inadequate description of the environmental setting for a project, "a proper analysis of project impacts [is] impossible." (*Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1122 [invalidating EIR containing only passing references to surrounding viticulture]; see *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 873–875.)

Here, the Notice of Preparation was issued in July 2007. As the administrative record documents, the EIR contains a 70-page analysis addressing potential impacts to biological resources on the Project site, including special status species. The biological resources section of the EIR was prepared by Booker Holton, an expert biologist, who investigated the Project site following the Notice of Preparation and relied on a number of sources—including the 2004 WRA Special Status Species Report, site visits, various state and federal plant and wildlife databases, input from regulatory agencies, arborist reports, vegetation mapping, and environmental communities mapping of the site—to support his analysis.

As defined in the EIR's biological resources section, special status species are "plants and animals legally protected under state and federal

9

endangered species acts or other regulations, or those species that the scientific community considers sufficiently rare to qualify for such listing." Based on WRA's June 2009 mapping of seven different habitat types on the Project site,[5] the EIR detailed the following information concerning the possible presence of special status plants and animals, and offered analyses concerning the impact of Project activities on such species and the effect of recommended mitigation measures.

### 1. *Special Status Plant Species*

The EIR described the existing conditions of the Project site as follows: "No special status plants have a moderate or high potential to occur on the Project site. This determination was based on the habitat types present on the site, the known habitat requirements for those special status plants potentially occurring in the general area, and the results of previous surveys of the property. Furthermore, the highly disturbed nature of the site would indicate that none are likely to be present." (Fn. omitted.)

In its impact analysis, the EIR concluded "the potential for the Project to result in adverse impacts on special status plant species is less than significant." In so concluding, the EIR explained: "Potential special status plant habitats in the Project area were evaluated in 2008 and cross-referenced with [the California Natural Diversity Database] and [the California Native Plant Society] lists of special status plants potentially present in the region. Based on the habitat types present and other knowledge of the site, special status plant species were determined to have either low potential for being present, or were determined to be not present at the Project site."

---

[5] The seven habitats are: non-native grassland; valley oak woodland; riparian woodland; mixed woodland; seasonal wetlands; Petaluma River (waters of the U.S.); and detention basin.

In light of this assessment, mitigation measures for the protection of special status plants were deemed unnecessary and none was recommended.

2. *Special Status Birds*

The EIR described "a moderate to high potential of occurrence for several special status bird species to occur in the Project area." According to the EIR, special status species that were likely to forage and/or nest in the types of habitats located on the Project site included white-tailed kite, Allen's hummingbird, loggerhead shrike, salt marsh common yellowthroat, California Ridgeway's rail, and California black rail. Another state endangered/federal threatened species that "may be present" on the site included the yellow-billed cuckoo, while other "state Species of Special Concern" that "could nest" in the Project site grasslands included "long-eared owl, Purple martin, yellow warbler, yellow-breasted chat, yellow-billed cuckoo, and Northern harrier."

In analyzing the Project's impact, the EIR concluded: "Based on existing habitat conditions, there is a moderate to high potential for occurrence of four special status bird species and raptors to occur at the Project site." Specifically, "[t]rees along the Petaluma River could provide suitable nesting habitat, and grasslands on the site provide suitable foraging habitat for the White-Tailed Kite, a [California Department of Fish and Wildlife] fully protected species. The Allen's Hummingbird, a [U.S. Fish and Wildlife Service] Species of Conservation Concern, are common breeding species in riparian and scrub habitats, and may breed at the Project site along Petaluma River. Grasslands and adjacent shrubs and riparian trees within the Project site provide suitable foraging and nesting habitat for Loggerhead Shrike, a [California Department of Fish and Wildlife] Species of Special Concern and a federal Species of Conservation Concern. Salt marsh

11

common yellowthroat, a federal Species of Conservation Concern and a [California Department of Fish and Wildlife] Species of Concern, may nest along Petaluma River in emergent vegetation or willows. Furthermore, the oak and riparian woodlands that exist on three sides of the Project site also provides suitable nesting habitat for several raptor species. [¶] Potentially significant impacts to these bird species include nest and/or young abandonment, resulting from grading or construction disturbance." Additionally, the impact analysis determined that "[w]hile project site surveys did not find habitat suitable for area bat species, the 2017 arborist study noted two trees with cavities" that "may provide suitable roosting habitat for some bat species such as the pallid bat."

The EIR then recommended two measures "[t]o address the potential for Project-related grading and construction activities to affect special status bird species." The first mitigation measure called for pre-construction nesting surveys of trees in the Project site in the event grading or construction is "scheduled during the nesting season of migratory birds (February 1 through August 30)" and for implementation of specified protection measures overseen by a qualified biologist in the event any active nest is found. The second mitigation measure recommended pre-construction tree roost surveys by a qualified biologist and other measures to protect bats during all tree removal and vegetation management activities on the Project site. The EIR determined these mitigation measures would "prevent harm to special status bird and bat species" and would mitigate impacts to such species "to a level of less than significant."

3. *Special Status Fish, Reptile, and Amphibian Species*

Citing the California Natural Diversity Database, the EIR reported that three special status fish species—Sacramento splittail, Central

12

California Coast ESU steelhead trout, and Chinook salmon—are "known or are suspected to occur in the reach of the Petaluma River that runs along the northeastern edge of the Project site."

The EIR additionally addressed the possible presence of the California Red-Legged Frog and the Western Pond Turtle, stating: "The assessment of existing conditions determined that special status species habitat is unlikely to occur on the uplands portion of the site that is proposed for development." Specifically, the uplands development portion provides "low potential" for these species due to lack of "suitable aquatic habitat" for the turtle species and "no suitable breeding habitat" for the frog species. However, the EIR cited "[California Natural Diversity Database] 2013" in reporting recorded occurrences of the frog species "within a three-mile radius of the site" and cited the 2004 WRA Special Status Species Report for its conclusion that "turtles may occasionally nest near the Project boundary."

In discussing the potential impacts of the Project on these special status species, the EIR reported that the "Project's proposed construction of a river terrace expanding the banks of the River, as directed by the General Plan, may result in both direct and indirect adverse effects." In particular, grading of the floodway terrace adjacent to the river and trimming and clearing of vegetation along the riverbank "could result in the removal of habitat for California red-legged frog and Western pond turtle." Such Project activities could also result in "degradation of special status fisheries habitat." Specifically, "[u]nintentional introduction of sediment into the water from erosion or runoff has the potential to affect steelhead, green sturgeon and/or the Sacramento splittail's feeding rates and growth, increase mortality, cause behavioral avoidance, and reduce macro-invertebrate prey populations," while unintended introduction into the water of petrochemicals associated

13

with grading equipment "could injure or kill these fish populations and/or their macro-invertebrate prey populations."

To address these impacts, the EIR made the following recommendations. JCJIC "shall obtain all required authorizations from the U.S. Army Corps, the [Regional Water Quality Control Board], the California Department of Fish and Wildlife, and other regulatory agencies with jurisdiction (as applicable) . . . . Copies of applicable permits shall be obtained by the Project applicant and provided to the City of Petaluma prior to grading, and the Project applicant shall implement all avoidance and minimization measures as required by these agency authorizations." For example, the EIR explained, such agency permits and approvals would be required before any dredged or fill material could be discharged into the Petaluma River, and the Project applicant would be required to comply with any terms and conditions imposed by the agencies for protection of Central California Coast steelhead trout and other fish.

In addition to all the avoidance and mitigation measures required by the regulatory agencies, the EIR recommended the following four additional mitigation measures to provide further protection: (1) to the extent feasible, grading in the river area and vegetation removal must be limited to specific dates in order to "avoid potential impacts to anadromous fish species and nesting birds" and to avoid interference with "adult spawning migrations or the outmigration of smolts"; (2) requiring a "qualified [U.S. Fish and Wildlife Service]-approved biologist" to "conduct pre-construction surveys of all ground disturbance areas within suitable habitats in the Project site to determine if California red-legged frogs and Western pond turtles are present" within 48 hours of the start of grading operations; (3) requiring the biologist to work with the resource agencies to determine whether and to

14

what extent relocation and/or exclusion buffers would be appropriate in the event the special status frog or turtle species are detected; and (4) implementing best management practices prior to and during construction, as required and/or approved by the resource agencies, to protect special status species and habitats, including active oversight and monitoring of activities by a [U.S. Fish and Wildlife Service]-approved biologist with "stop-work authority."

According to the EIR, implementation of all identified mitigation measures "would reduce potential impacts of the proposed Project on special status species and sensitive habitats to a level of less than significant. It is anticipated that once construction of the Petaluma River terrace and the [Habitat Mitigation Monitoring Plan] is complete, habitat for these species will be restored and possibly increased as a result."

     *4. Analysis*

As the foregoing reflects, the EIR's discussion of special status plant and animal species drew not only from the 2004 WRA Special Status Species Report, but also from information of the site's environmental conditions obtained by experts who conducted subsequent evaluations and site visits.[6] After describing the habitats existing on the Project site, the EIR identified—based on cross-referencing such habitats with the habitats of the special status species listed in state and federal plant and animal databases and also

---

[6] Apparently, the 2004 WRA Report did not include a survey for special status species on 6.24 acres of the Project site, including the Petaluma River and the riparian habitat along the river. The EIR, however, incorporated the Habitat Mitigation Monitoring Plan as an appendix to address the concern that the river terracing component of the Project "will unavoidably impact certain biological resources along the Riverbanks including riparian and oak woodland habitat." The EIR incorporated the information from the monitoring plan as part of its special status species analysis.

15

based on other site-specific information—the special status species that occur or might occur on the site and be impacted by the Project. All this resulted in the EIR's discussion of 11 special status animals with moderate to high potential for occurrence on the Project site—including six bird species, three fish species, one frog species, and one turtle species—plus the potential for roosting on the site by some bat species. Thus, not only did the EIR base its analysis on "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts" (Guidelines, § 15384, subd. (b)), but it amply demonstrated the " 'analytic route' " from such evidence to the action recommended and ultimately taken. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 404.)

Petitioners challenge the EIR as deficient because: (1) the City never investigated the Project's baseline conditions as of 2007 when the Notice of Preparation was published, and the record contains no evidence of studies or surveys for special status species at that point in time; (2) substantial evidence does not support the EIR's discussion of baseline conditions for special status species; and (3) absent accurate and complete information on the environmental setting, the EIR could not and did not adequately analyze or mitigate the Project's impacts on protected species. We are not persuaded.

These claims are premised largely on the assumption that the information in the 2004 WRA Special Status Species Report provided an inadequate basis for evaluating the Project's impact on special status species because the report preceded the 2007 Notice of Preparation by three years and was based on a site assessment conducted in 2001. As a preliminary matter, we reject any suggestion that the 2004 report was based solely on a 2001 site survey. Notably, Appendix A to the report contained information reflecting a comprehensive assessment of the potential presence of special

16

status plant and animal species on the Project site based on WRA's review of the U.S. Fish and Wildlife Service "Official Species Lists for Cotati USGS Quad (2004)," the California Department of Fish and Game "Natural Diversity Data Base (2003)," "searches of the Cotati USGS Quad and surrounding 9 Quads," and the California Native Plant Society "electronic inventory (2004)." And apart from the 2004 WRA Report, the EIR indicated its analysis included updated database reviews in 2008, 2010, and 2013, and was based on information gathered from site visits in 2009, 2016,[7] and 2017.

Petitioners insist that a study conducted at the time of the Notice of Preparation is indispensable for setting the appropriate special status species baseline. But they cite no authority suggesting that CEQA is violated where, as here, the EIR's analysis on the topic was drawn from site visits, studies, and habitat evaluations that were undertaken both before and after the Notice of Preparation. Petitioners do not contend the EIR's description of the existing conditions and habitats on the undeveloped Project site was incomplete or otherwise flawed for purposes of assessing the presence of special status species. As the California Supreme Court has explained, "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328; see *Save Our Peninsula, supra*, 87 Cal.App.4th at p. 125 ["the date for establishing baseline cannot be a rigid one"].) Agencies enjoy the discretion to decide, in the first instance, how to realistically measure the existing physical conditions without the proposed project (*Communities for a Better Environment*, at p. 328), and the selection of a baseline will be upheld

---

[7]     JCJIC's appellate briefing represents that this site visit actually occurred in 2015 and that the EIR's reference to 2016 was a typographical error.

when supported by substantial evidence (e.g., *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 562–563; *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 336–337). The record here demonstrates that substantial evidence supports the EIR's analysis of the special status species that were subject to the Project's impact.

Indeed, petitioners point to no evidence that the biological conditions existing on the Project site in 2007 differed from those in 2004 when WRA conducted its cross-referencing study, or in later years when updated plant and wildlife databases were consulted. For example, no special status plant species were reported in a 2008 evaluation of the plant habitats in the Project area, or in a March 2009 vegetation mapping of the Project site, or in a June 2009 biological communities mapping.[8] This was consistent with the 2004 WRA Report's account that no special status plants had ever been observed on the Project site.[9] The information in the EIR also aligned with the information contained in the 2008 EIR for General Plan 2025, which encompassed the Project site and featured its own analysis of special status plant and animal species for the broader Petaluma area.

Moreover, when experts and regulatory agencies brought new information to JCJIC's attention, JCJIC responded by working with experts and City staff to ensure that the EIR addressed such matters. Consequently, the EIR addresses several special status species that were not mentioned in the 2004 WRA Report. For example, in 2015 the City and regulatory

---

[8] Petitioners suggest the March 2009 vegetation mapping and the June 2009 biological communities mapping are not in the EIR or in the record. That is inaccurate.

[9] The administrative record contains a September 7, 2004, document in which WRA elaborated that "surveys conducted by Jones and Stokes in 1997 for the Corona Reach Specific Plan (which included the present Sid Commons project area) resulted in no special status plants observed."

agencies alerted JCJIC of the need for additional evidence regarding on-site fish species. This prompted an analysis that ultimately resulted in the EIR's evaluation that the Project's grading and construction activities could result in adverse effects to three fish species and inclusion of recommendations to mitigate such effects.[10] Additionally, a 2017 arborist study noted two trees with cavities that may provide suitable roosting habitat for some bat species, which led to the EIR's inclusion of recommended mitigation measures to protect bats during all tree removal and vegetation management activities on the Project site.

Despite a professed concern that the EIR inadequately addressed the Project's impact on plants and wildlife, petitioners suggest the foregoing information is irrelevant because, among other things, no additional special status species studies were conducted and because studies post-dating 2007 have no bearing on the site conditions existing in 2007. But again, petitioners do not challenge the accuracy or completeness of the EIR's description of the Project site's existing biological and habitat conditions; nor do they point to anything indicating that such conditions were materially different in 2007 for purposes of a special status species analysis. "The fact that additional studies might be helpful does not mean that they are required." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1396; Guidelines, § 15204, subd. (a).) And, if anything, the EIR's inclusion of the post-2007 information indicates that the EIR was prepared with an eye toward "completeness" and "a good faith effort at full disclosure." (Guidelines, § 15151.)

---

[10]     Nothing in the record indicates continued concern on the part of the regulatory agencies after the EIR addressed the identified informational gaps.

Contrary to petitioners' contention, *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 does not compel a different conclusion. There, the EIR for a housing project was found inadequate and misleading because it understated the significance of the adjacent San Joaquin River, ignored a nearby wetland wildlife preserve, and did not address whether wetland areas were on the project site, despite comment letters flagging such concerns. (*Id*. at pp. 722–729.) Here, in contrast, there is no evidence that the EIR omitted or inaccurately described the material aspects of the biological conditions on or near the Project site, and the EIR expressly took into account important information concerning nearby habitats.

Petitioners' other authorities are likewise unavailing. In *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48 (*Madera Oversight Coalition*), the Notice of Preparation was issued in 2006 but the EIR's traffic analysis included references to three different baselines, one of which was a future baseline using traffic conditions forecast for the year 2025. (*Id*. at pp. 59, 92–93.) After holding that lead agencies have no discretion to adopt a baseline that uses conditions predicated to occur on a date subsequent to an EIR's certification (*id*. at pp. 89–90, 92), the Court of Appeal remanded the matter with instructions to grant the petition for writ of mandate as to the EIR's traffic analysis because of its failure to clearly identify the baseline used in analyzing the project's impacts (*id*. at pp. 107–108).[11] In *Save Our Peninsula, supra*, 87 Cal.App.4th 99, the court rejected

_____

[11] The California Supreme Court disapproved *Madera Oversight Coalition, supra*, 199 Cal.App.4th 48, insofar as it held "an agency may never employ predicted future conditions as the sole baseline for analysis of a project's environmental impacts." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457.)

an EIR's baseline estimate of a property's water usage that relied on "a 'standard water demand factor for irrigated pastureland,' " because substantial evidence did not show the property was in fact irrigated pastureland. (*Id*. at p. 122.) Finally, in *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, the EIR for a project to provide additional water for consumptive use was found inadequate for purposes of determining the project's impacts because, among other things, it failed to adequately describe the baseline environment and historical operations for pre-project water distribution. (*Id*. at pp. 941, 954–955.) Unlike the EIRs in those cases, the EIR here did not purport to measure impacts based on conditions that did not exist on the Project site or on conditions that were forecasted to exist at some point in the distant future. And as discussed, there is no indication that the site conditions documented in the instant EIR were incorrectly or incompletely described for purposes of a special status species analysis.

Petitioners also contend the EIR's references to studies and site visits did not constitute substantial evidence supporting its special status species analysis because such studies and visits were not included in the administrative record and were not otherwise adequately documented, e.g., the names of the participants and descriptions of what took place are not disclosed in the record. But the CEQA Guidelines make clear that factual information in the EIR itself "may constitute substantial evidence in the record to support the agency's action on the project if its decision is later challenged in court." (Guidelines, §15121, subd. (c); see *Karlson v. City of Camarillo* (1980) 100 Cal.App.3d 789, 801 ["EIRs constitute evidence"].) Moreover, section 15148 of the Guidelines provides: "Preparation of EIRs is dependent upon information from many sources, including engineering

21

project reports and many scientific documents relating to environmental features. *These documents should be cited but not included in the EIR.* The EIR shall cite all documents used in its preparation including, where possible, the page and section number of any technical reports which were used as the basis for any statements in the EIR." (Italics added.)

Here it is unclear from the record whether the site visits cited in the EIR resulted in the type of documents contemplated by section 15148 of the Guidelines. But even assuming that to be the case, the EIR need not include all the reports used in its preparation. (Guidelines, § 15148.) Thus, an agency's failure to disclose a consultant's memo or to provide a comprehensive summary of its underlying assumptions and data does not necessarily render an EIR inadequate. And while " 'we must ensure strict compliance with the procedures and mandates of [CEQA],' " we also must remain "mindful of the purposes of the statute in deciding how strict to be in interpreting the Guidelines." (*El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1354 (*El Morro*).) In this case, the EIR's analysis incorporated the information gleaned from the site visits and databases and generally identified the source and date of such information.

Moreover, the City provided an extended public review and comment period for the Draft EIR from March 1 to May 21, 2018, affording petitioners an ample opportunity to request the background details of the identified site visits. In *El Morro, supra,* 122 Cal.App.4th 1341, for example, when the petitioner complained of the draft EIR's failure to specifically reference each of its supporting technical reports, the agency responded with a list of the reports and advised the petitioner the reports were available for public review in the agency's office. (*Id.* at p. 1353.) Here, however, petitioners first

raised their complaint just hours before the City Council's February 3, 2020, hearing on the Final EIR, which did not allow the City to respond in a similar manner.

In sum, petitioners fail to show that the EIR was rendered legally inadequate simply because no special status species analysis was conducted in 2007. (See *Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 117.) As the EIR explains, its special status species analysis was drawn from site visits, studies, and habitat evaluations that were undertaken both before and after the Notice of Preparation, and there is no indication the analysis was flawed due to material changes in the on-site habitats over the time period at issue. Thus, the EIR's analysis and the information upon which it relied allowed for intelligent decisionmaking concerning the Project's impacts on the identified special status bird and bat species that might forage, roost, or nest on the site, as well as its impacts on special status fisheries habitat and on special status turtle and frog species.

Having rejected the claimed inadequacy of the EIR's special status species analysis, we reject petitioners' further contention that the EIR could not and did not offer recommendations that would adequately mitigate the Project's impacts on these protected species.

## C. The EIR Properly Analyzed Public Safety Impacts Relating to Emergencies

In accordance with CEQA, CEQA Guidelines, the City's plans and policies, and agency and professional standards, the EIR acknowledged the Project's impact would be considered significant if the Project would, as indicated in Appendix G of the Guidelines,[12] "[i]mpair implementation of or

---

[12] Appendix G of the Guidelines contains a sample checklist of environmental considerations that lead agencies may use to assess a project's impact.

physically interfere with an *adopted* emergency response plan or emergency evacuation plan."  (Italics added.)

The EIR surveyed the applicable regulatory landscape and highlighted the City's adoption of the "2013 California Fire Code," which incorporates the "2012 Edition of the International Fire Code."  The EIR identified the following emergency-related code provisions relevant to the proposed Project: "**D103.3—Turning Radius.**  The minimum turning radius shall be determined by the Fire Code Official or as approved by local standards. [¶] **D103.4—Dead Ends.**  Dead-end fire apparatus access roads in excess of one hundred fifty feet (150') (45.720 m) shall be provided with width and turnaround provisions in accordance with the local agency requirements for public streets or as approved by local standards.  [¶] **D106.1—Projects Having More Than Fifty (50) Dwelling Units.**  Multiple-family residential projects having more than fifty (50) dwelling units shall be provided with two (2) separate and approved fire apparatus access roads."

In view of these code provisions, the Draft EIR had proposed emergency access to the Project site via existing Graylawn Avenue, with EVA (Emergency Vehicle Access) at Bernice Court and the creation of an at-grade crossing over railroad tracks (the Shasta Avenue extension).  But the Final EIR proposed to eliminate the at-grade rail crossing in response to concerns that the crossing "would substantially increase roadway hazards and hazards for emergency vehicles accessing the Project site" and generate other undesirable impacts and complications.  Instead, the Final EIR explained that "[t]wo driveway connections are proposed to connect the Project to Graylawn Avenue" and, as proposed in the Draft EIR, Bernice Court would provide "a secondary means of emergency access to the site."  The Bernice Court connection would provide emergency vehicle access "designed to meet

24

all fire apparatus, turning radius and turnaround requirements of the Petaluma Fire Code."

Significantly, the EIR reported that "[t]he Petaluma Fire Department has reviewed this proposed EVA route and found it to provide acceptable emergency access to the site."  Moreover, the EIR explained, the "EVA design shall also meet additional recommendations of the City Fire Marshal to prohibit parking and other obstructions, and to ensure that the Bernice Court EVA is continuously available for emergency use (e.g., bollards, red curb or red pavement striping, no-parking signage, etc.).  Final EVA design measures, including specific design details demonstrating these requirements will be provided and reviewed pursuant to the [Site Plan and Architectural Review] process and subject to review and approval by the Fire Marshal."  In light of this analysis, the EIR determined the public safety/emergency access impacts of the Project were "Less than Significant."  All this amply supported the EIR's conclusion that the Project would not "[i]mpair implementation of or physically interfere with an *adopted* emergency response plan or emergency evacuation plan."  (Guidelines, Appendix G, italics added.)

Notably, petitioners fail to identify any other adopted emergency response or emergency evacuation plans that required EIR analysis.  Instead, they cite to a CEQA guideline providing that an EIR "should evaluate any potentially significant direct, indirect, or cumulative environmental impacts of locating development in areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas), including both short-term and long-term conditions, as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas."  (Guidelines, § 15126.2, subd. (a).)  In petitioners' view, the EIR was legally deficient because it omitted an analysis of egress and evacuation safety even

25

though numerous current and former neighbors of the site submitted public comment sharing their experiences with flooding and grass fires in the area.

Petitioners also cite to Professor Thomas Cova's submission of a one-page letter less than a week before the City Council's February 3, 2020, hearing on the Final EIR. In his letter, Professor Cova described himself as a "National Evacuation Expert" and opined that the Project may have significant public safety impacts in the event residents moving into the planned Sid Commons Apartments and residents from the neighboring Oak Creek Apartments have to evacuate from hazardous events such as "flooding along the Petaluma River, earthquakes, fire or a railway hazardous materials spill." Noting that all such residents will be forced to use the same street for evacuations, Professor Cova called for further study of the impact of additional development.

Even assuming, generously, that the submissions from the public and from Professor Cova provided evidence of a potential public safety impact as contemplated in section 15126.2 of the CEQA Guidelines, we may not reweigh conflicting evidence, and such submissions provide no basis for setting aside the City's certification of the EIR. (See *Laurel Heights*, *supra*, 47 Cal.3d at p. 393.) Rather, petitioners bear the burden of proving the EIR is legally inadequate. (*Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 117.)

Our review of the EIR and administrative record discloses no cause for reversal. Case law establishes that an agency may rely on the expertise of its staff to determine that a project will not have a significant impact. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1379–1380 [upholding sufficiency of agency's initial study].) Here, a City staff memo prepared for the February 3, 2020, hearing corroborated the public safety analysis in the EIR. In addressing public concern that "floodwaters within Graylawn and

26

Jess Avenues would interfere with evacuation in the event of a 100-year flood," the staff memo highlighted the point that the "Project does not propose any development within the regulatory floodplain of the Petaluma River. All development associated with the Sid Commons Apartment Project, including access roads and infrastructure are located outside of the 100-year floodplain." This analysis was consistent with a FEMA floodplains mapping featured in the Final EIR showing that key access roadways were located outside the 100-year floodplain.[13]

The staff memo also reflected information from the City's Assistant Fire Chief, who serves as "emergency operations manager for the City's Emergency Operations Center." According to the memo, the Assistant Fire Chief confirmed that "the *Fire Department does not have significant flood or fire access/egress concerns with development above the 100-year floodplain at the site.* He stated that if Graylawn Avenue were to be impacted by

---

[13] The staff memo noted in more detail that the FEMA mapping had differed from the hydrology maps presented in the Draft EIR which showed "inundation of the Graylawn Avenue street section in a 100-year flood event," and that this discrepancy generated a Planning Commission "query regarding the depth of floodwaters anticipated on Graylawn Avenue." The memo then explained that subsequent conversations between the City Engineer and the hydrologist who prepared the modeling work on behalf of the City "led to the finding that the project modeling (FEIR Figures 4-3 through 4-8) did not account for recent completion of the Payran area flood work and its impact of removing from the floodplain the area that FEMA designates as Zone A99 on its current mapping (FEIR Figure 4-2)." As explained in the Final EIR, "[t]he A99 designation is for areas that have received substantial flood improvements, but where flood control projects are not yet complete or not yet accounted for in FEMA mapping." Thus, the staff memo concluded, "consistent with the FEMA mapping, Graylawn and Jess Avenues, as well as properties within the A99 Zone *remain outside of the 100-year floodplain*, both in the current condition and after the upstream terracing and cumulative upstream terracing with detention directed by the General Plan." (Italics added.)

27

floodwaters in the future, tall/heavy vehicles and boats would be available for rescue/evacuations.  Additionally, the area is not in the City's 'High Fire Severity Zone' where large rapid fire development potential exits [*sic*].  While there are empty fields nearby that could pose a hazard of fire spread, he notes, these areas are on level ground with light fuels and any fire in the fields or spread to any structures nearby would likely require an evacuation of only impacted buildings, not the entire complex.  The Fire Marshal's acceptance of the EVA at Bernice Court as the second point of access will provide adequate access in the case of an emergency."[14]  (Italics added.)

Relying on *Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, petitioners characterize the City staff memo as a post-EIR analysis that is insufficient to remedy the EIR's omission of a required public safety discussion of evacuation impacts.  *Sierra Watch* involved an EIR for a new resort with 850 lodging units, 30,000 square feet of commercial space, over 3,000 parking spaces, and housing for up to 300 employees on approximately 94 acres in Olympic Valley near Lake Tahoe.  (*Id*. at p. 92.)  There, the petitioner challenged the adequacy of the EIR because, among other things, its discussion of the environmental setting did not sufficiently acknowledge the proximity and uniqueness of Lake Tahoe.  (*Id*. at p. 96.)  The Court of Appeal agreed, observing that the EIR "offered only one parenthetical reference to Lake Tahoe" without addressing the lake's importance, its characteristics, or its current condition.  (*Ibid*.)  Nor did the EIR consider the impact of the project's generation of an additional 23,842 vehicle miles traveled (VMT) per day on the clarity of the lake and the air quality of the

---

[14]    Although petitioners are correct that the City staff memo does not mention when the Assistant Fire Chief made his statements to staff, the administrative record contains documentation that the statements were made in an email to staff dated January 14, 2020.

lake basin.  (*Id*. at pp. 97–102.)  Although the county eventually analyzed the impact of the additional VMT a few days before certifying the EIR (*id*. at p. 102), the Court of Appeal concluded the analysis came far too late to permit informed decisionmaking (*id*. at p. 103).

*Sierra Watch* offers no parallel to the situation here.  As recounted above, the EIR identified the relevant provisions in the City's emergency response plan and took into account specific information about the Project site and the actual threat of flood or fire at the site.  Drawing from such information, the EIR then considered whether the Project would "[i]mpair implementation of or physically interfere with an *adopted* emergency response plan or emergency evacuation plan" (Guidelines, Appendix G, italics added) and concluded it would not.  This was sufficient to demonstrate the analytic route from specific underlying evidence to the ultimate conclusion.  (*Laurel Heights*, *supra*, 47 Cal.3d at p. 404.)  Moreover, even though the City had not adopted an emergency evacuation plan, the City staff memo acknowledged the public concern over potential flood or fire evacuations.  Staff spoke with the City's Assistant Fire Chief and reported his assurance that the City Fire Department did not have significant flood "access/egress concerns" because the proposed development was situated above the 100-year floodplain and because "tall/heavy vehicles and boats would be available for rescue/evacuations" in the event of future floodwaters on Graylawn Avenue.  The memo also documented the City's Assistant Fire Chief's confirmation that the Fire Department had no significant fire-related "access/egress concerns" because the area was not within the City's " 'High Fire Severity Zone' " where large rapid fire development potential exists.  Thus, the staff memo provides additional evidence supporting the City's certification of the EIR.

29

In short, petitioners have not met their burden of proving any inadequacy of the EIR with regard to its analysis of public safety impacts relating to emergencies.  (*Save Our Peninsula*, *supra*, 87 Cal.App.4th at p. 117.)

## Disposition

The judgment is affirmed.  Costs on appeal are awarded to real party in interest.


_____
Fujisaki, J.



WE CONCUR:


_____
Tucher, P.J.



_____
Rodríguez, J.


*Save N. Petaluma Rivers & Wetlands et al. v. City of Petaluma* (A163192)

30

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAVE NORTH PETALUMA RIVER AND WETLANDS et al., <br><br>    Plaintiffs and Appellants, <br><br>v. <br><br>CITY OF PETALUMA et al., <br><br>    Defendants and Respondents; <br><br>J. CYRIL JOHNSON INVESTMENT CORPORATION, <br><br>    Real Party in Interest and Respondent. | A163192 <br><br>(Sonoma County <br>Super. Ct. No. SCV-266157) |

BY THE COURT:

The written opinion which was filed on November 14, 2022, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and is ordered published in the official reports.

Date:__December 13, 2022_____          ____TUCHER, P.J._____P.J.

Trial Court:      Sonoma County Superior Court

Trial Judge:      Hon. Arthur A. Wick

Counsel:      Lozeau/Drury, Rebecca L. Davis and Brian B. Flynn for Plaintiffs and Appellants.

Jarvis Fay, Rick William Jarvis, Christine L. Crowl; Eric W. Danly, City Attorney and Jordan Green, Assistant City Attorney for Defendants and Respondents.

Reuben Junius & Rose, Matthew David Visick and Sabrina Saba Eshaghi for Real Party in Interest and Respondent.